UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| EDEKKA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:15–cv–541–JRG |
| v. | ) | |
| | ) | LEAD CASE |
| 3BALLS.COM, INC., | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| EDEKKA LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:15–cv–555–JRG |
| | ) | |
| BALSAM HILL LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## BALSAM'S MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Balsam Hill LLC ("Balsam") moves to dismiss the patent infringement complaint of Plaintiff eDekka LLC ("eDekka") (ECF No. 1) ("Complaint"). Pursuant to Fed. R. Civ. P. 10(c), Balsam adopts by reference AM Retail Group's Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted ("AM Retail Motion"), filed on June 25, 2015, as ECF No. 8 in *eDekka LLC v. AM Retail Group Inc. d/b/a Wilsons Leather*, Case No. 2:15–cv–556–JRG (E.D. Tex.). For the reasons set forth below and in the AM Retail Motion, the complaint should be dismissed with prejudice.

## STATEMENT OF THE ISSUE

Do the claims of the asserted patent, U.S. Patent No. 6,266,674 B1 ("'674 Patent" or "asserted patent") (ECF No. 1–1), claim patent–ineligible subject matter under 35 U.S.C. § 101?

## BACKGROUND

Purporting to have issued on July 24, 2001, and attached to the Complaint as Exhibit A, *see* ECF No. 1–1, the '674 Patent  is entitled, "Random Access Information Retrieval Utilizing User–Defined Labels." *Id*.; *see also* Complaint ¶ 1; *but see* Complaint ¶ 10 (alleging that the '674 Patent issued on July 21, 2001). eDekka claims to be the owner of the '674 Patent by assignment. Complaint ¶¶ 1, 10. eDekka makes a claim of direct infringement against Balsam, *see id*. ¶¶ 13, 15, based on the allegation that Balsam "makes, uses, provides, and/or offers Checkout, Shopping Cart, and/or Shopping Bag functionality on [Balsam's] website www.balsamhill.com   for customers in a way that infringes the '674 patent ('Accused Instrumentality')." *Id*. ¶ 13 (brackets added). In particular, the Complaint alleges that Balsam infringes independent method claim 1 and independent apparatus claim 17, both quoted in the Complaint and reproduced below. *See* Complaint ¶¶ 11–12 (quoting claims 1 and 17 and numbering the elements). The Complaint offers no additional detail regarding the Accused Instrumentality or asserted claims.

Other than the fact that one is a method and the other an apparatus claim, claims 1 and 17 are substantively identical. They claim nothing more than simple data–handling principles articulated in functional language: storing information and associating that information with a label. These claims have *no* content other than storing and labeling data. The elements in *italics* below relate to the abstract idea of storing data; the <u>underlined</u> elements relate to the abstract idea of labeling data.

| Claim 1 | Claim 17 |
|---|---|
| Method for storing information provided by a user which comprises: | Apparatus for storing information provided by a user which comprises: |
| [1*] in response to user input, receiving and storing information*; | [1] *info input means, in response to user input, for receiving and storing information*; |
| [2] in response to user input, designating the information as data while the information is being received; | [2] data means, in response to user input, for designating the information as data while the information is being received; |
| [3] in response to user input, designating at least a portion of the information as a label while the information is being received; | [3] label means, in response to user input, for designating at least a portion of the information as a label while the information is being received; |
| [4] *in response to user input, traversing a data structure and providing an indication of a location in the data structure;* | [4] *search means, in response to user input, for traversing a data structure and for providing an indication of a location in the data structure;* |
| [5] *in response to user input, storing the label at the location in the data structure; and* | [5] *means, in response to user input, for storing the label at the location in the data structure; and* |
| [6] associating the label with the data. | [6] associating means, in response to user input, for associating the label with the data. |
| '674 Patent, 18:4–19 (brackets added). | '674 Patent, 20:34–51 (brackets added). |

The additional elements of the remaining claims of the '674 Patent do *not* concretize the abstract idea of storing and labeling information. Some reorder the steps of claims 1 and 17. Others limit the information provided to audio information and the data structure to a hierarchy. (Such claims cannot, for obvious reasons, be asserted against the shopping cart functionality of a retail website.) Others include the abstract concepts of "conveying," "deleting," "switching," or "indicating" information or labels. Still others characterize certain information as "first," "second," or "further."

| Claim No(s). | Additional Element(s) |
|---|---|
| 2, 4, 6, 8, 10, 12, 14, 16, 23, 25–28, 33–34, 41, 43–46, 49, 52 | Information is audio information; data structure is hierarchical.<br><br>'674 Patent, 18:19–21, 39–41, 58–60; 19:9–11, 29–31, 48–50; 20:6–8, 31–33; 21:24–26, 38–49, 65–67; 22:1–3, 62–64; 23:4–15; 24:4–6, 15–17. |
| 3, 9, 18, 20, 30, 36, 38, 48 | Conveying stored information or a label.<br><br>'674 Patent, 18:23–38; 19:12–28; 20:52–56; 20:64–21:5; 21:56–58; 22:22–26, 34–53; 24:1–3. |
| 5, 11 | Designating information as "first information" and label as "second information."<br><br>'674 Patent, 18:42–57; 19:32–47. |
| 7, 35 | Reordering the elements of claim 1 or claim 17.<br><br>'674 Patent, 18:61–19:8; 22:4–21. |
| 13, 15, 19, 24, 37, 42 | Storing and labeling further information.<br><br>'674 Patent, 19:51–20:5; 20:9–30, 57–63; 21:27–37; 22:27–33; 22:65–23:3. |
| 21, 39 | Deleting a label.<br><br>'674 Patent, 21:7–15; 22:44–52. |
| 22, 40 | Switching labels stored at two different locations.<br><br>'674 Patent, 21:16–23; 22:53–61. |
| 29, 31, 47, 50 | Indicating a location.<br><br>'674 Patent, 21:50–52, 56–58; 23:16–18; 24:6–8. |
| 32, 51 | Information is audio information; data structure is hierarchical; indicating whether another location is above, below, or at same level as information.<br><br>'674 Patent, 21:59–64; 24:9–14. |

None of these additions purports to state anything other than abstract concepts in generic language.

The claim language contrasts with the specification of the '674 Patent, which focuses on a much narrower "invention," one which has nothing to do with the Internet or retail websites. Indeed, the terms "Internet" and "world wide web" appear nowhere in the patent.

In brief, the specification describes a method of storing and labeling audio recordings using a cassette tape recorder with a microphone and a set of directional buttons. *See*, *e.g.*, '674 Patent, Fig. 7. The problem the claimed invention purports to address is providing a "method and apparatus for storing and retrieving information which enable a user to access the information randomly in a manner which can be customized by the user who enters the information." '674 Patent, 1:39–43. The invention is, according to the specification, an improvement on the prior art of the "written list" or "cassette tape recorder." *Id*., 1:21 ("written list"), 25 ("cassette tape recorder").

The preferred means of achieving this goal, "used in connection with the storage of audio information such as speech information, music, and the like," *id*., 1:60–61, works as follows: "whenever a user speaks into a microphone, the user defines a portion of the speech to serve as a label by a label–defining process, such as, for example, pressing a pad on a keypad device." *Id*., 1:61–64. In addition to labeling such audio information, the user may "define a data structure, such as a hierarchical structure, for the labels." *Id*., 2:5–7. And those labels may be deleted or reordered as necessary. *Id*., 2:7–9. The specification also "contemplates embodiments wherein the information may be input in the form of speech, facsimile information ("FAX"), text information, and mixed forms of information such as speech and FAX, FAX and text, and so forth." *Id*., 2:29–33. The specification further contemplates use of the invention for "dictation." *See id*., 16:20. These narrow applications have nothing whatsoever to do with e–commerce, much less shopping carts on e–commerce websites.

To the extent that the specification relies on equipment, it discloses only equipment operating generically in a manner already well known to those skilled in the art, as it freely (and frequently) concedes:

- "Microphone **35** is apparatus which is well known to those of ordinary skill in the art." *Id.*, 3:13–14.

- "A/D [analog–to–digital] converter **30** is apparatus which is well known to those of ordinary skill in the art." *Id.*, 3:18–19 (brackets added).

- "Keypad **50** is apparatus which is well known to those of skill in the art." *Id.*, 3:23–24.

- "Those of ordinary skill in the art understand that memory **20** may comprise memory of a specific type, for example, solid state RAM, for storing programs and may comprise solid state RAM or magnetic storage such as disc storage for storing audio input and/or labels and data structure information." *Id.*, 3:41–46.

- "D/A [digital–to–analog] converter **40** is well known to those of ordinary skill in the art." *Id.*, 4:23–24 (brackets added).

- "In another embodiment, the information and data structure may be transmitted to the apparatus by any one of a number of data transfer mechanisms which are well known to those of ordinary skill in the art such as a data link." *Id.*, 16:35–39.

- "For example, using methods well known to those skilled in the art, one can download information and labels in digitally encoded form." *Id.*, 17:6–9.

- "Furthermore, using techniques which are well known to those skilled in the art, one could download information from data transmitted as one changes location." *Id.*, 17:14–16.

- "Peripheral equipment for use in inputting and/or outputting information in these forms is well known to those of ordinary skill in the art." *Id.*, 17:36–38.

- "[D]ata input as text may be transformed in a manner which is well known to those of ordinary skill in the art." *Id.*, 17:43–44 (brackets added).

Thus, it should be self–evident that, in identifying the "Checkout, Shopping Cart, and/or Shopping Bag functionality on [Balsam's] website www.balsamhill.com" as the "'Accused Instrumentality,'" Complaint ¶ 13 (brackets added), eDekka is reading the claims of the '674 Patent to encompass something much broader than what the specification describes. Such broadly worded claims are not patent–eligible under 35 U.S.C. § 101 ("Section 101").

## ARGUMENT

**Motion to Dismiss Standard.** Under the well–known motion to dismiss standard, after accepting all well–pleaded facts as true, "the Court determines whether the complaint alleges 'enough facts to state a claim to relief that is plausible on its face.'" *Clear With Computers, LLC v. Dick's Sporting Goods, Inc.*, 2014 WL 923280, *2 (E.D. Tex. Jan. 21, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Documents attached to the Complaint—here, the asserted patent—are part of the pleadings, and thus may be reviewed in ruling on a motion to dismiss. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002).

The question whether a patent claims eligible subject matter under Section 101 may be decided on the pleadings. The Federal Circuit and this Court have routinely decided the issue of patent–eligibility against patent–asserters on the pleadings. *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 2015 WL 3852975 (Fed. Cir. June 23, 2015) (affirming grant of motion to dismiss); *OIP Techs., Inc. v. Amazon.com, Inc.*, 2015 WL 3622181 (Fed. Cir. June 11, 2015) (affirming grant of motion for judgment on the pleadings); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014), *cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc.*, 2015 WL 2457913 (June 29, 2015) (affirming grant of motion to dismiss); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (affirming grant of motion for judgment on the

pleadings); *Clear With Computers, LLC v. Altec Indus., Inc.*, 2015 WL 993392 (E.D. Tex. Mar. 3, 2015) (Gilstrap, J.) (granting motion to dismiss); *Loyalty Conversion Systems, Corp. v. American Airlines, Inc.*, 66 F. Supp. 3d 829, 2014 WL 4364848 (E.D. Tex. 2014) (Bryson, J., sitting by designation) (granting motion for judgment on the pleadings); *Dick's Sporting Goods*, 2014 WL 923280 (Davis, C.J.) (granting motion for judgment on the pleadings).

It is, in fact, preferable for legal, policy, and prudential reasons to resolve this issue at the outset of the litigation based on the pleadings.

> Addressing 35 U.S.C. § 101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, it also works to stem the tide of vexatious suits brought by the owners of vague and overbroad business method patents. Accordingly, where, as here, asserted claims are plainly directed to a patent ineligible abstract idea, [the Federal Circuit has] repeatedly sanctioned a district court's decision to dispose of them on the pleadings.

*OIP Techs.*, 2015 WL 3622181 at *4 (Mayer, J., concurring) (collecting cases) (brackets added).

Thus, claim construction is not a prerequisite to the resolution of the Section 101 issue. *See Ultramercial*, 772 F.3d 709 at 719 ("No formal claim construction was required because the asserted claims disclosed no more than an abstract idea garnished with accessories and there was no reasonable construction that would bring them within patentable subject matter.") (quotation, brackets, and citation omitted); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101.") (brackets added); *Dick's Sporting Goods,* 2014 WL 923280, at *3–4; *see also Alice*, 134 S. Ct. 2347 (concluding that claims were subject matter–ineligible without performing claim construction). Consistent with the motion to dismiss standard discussed above, to the extent a motion arguably implicates an issue of claim construction, a court may apply constructions favorable to the patent–owner in making the Section 101 determination on the pleadings. *See Content Extraction & Transmission LLC v.*

*Wells Fargo, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) ("The district court construed the terms identified by CET in the manner most favorable to CET, necessarily assuming that all of CET's claims required a machine, even though several claims do not expressly recite any hardware structures.") (internal quotation, brackets, and citation omitted).

**The *Alice* Test.** Section 101 contains a threshold test of patent–eligibility. *See Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (Kennedy, J.) ("threshold test"); *id.* at 3236 (Stevens, J., concurring in the judgment) ("threshold condition"). "Whoever invents or discovers any new or useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The converse is also true: who does not, may not.

The Supreme Court has "long held that [Section 101] contains an important, implicit exception. Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013) (brackets added; internal quotation and brackets omitted). In its recent opinions in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012) (laws of nature), and *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014) (abstract ideas), the high court has set out the two–part test to assess the subject matter–eligibility of a patent claim. The focus of the analysis is on the claims. *See Alice*, 134 S. Ct. at 2355 ("[W]e consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent–eligible application.") (brackets added and internal quotation omitted); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("In considering patent eligibility under § 101, one must focus on the claims."). Concreteness in the specification cannot cure abstractness in the claims. *Dick's Sporting Goods*, 2014 WL

923280 at *5 ("CWC's argument, however, misplaces the focus of the eligibility analysis on the specification rather than the claims.") (citation omitted).

At step one, the Court must "determine whether the claims at issue are directed to patent–ineligible concepts." *Alice*, 134 S. Ct. at 2355. To answer that question, the Court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent–eligible application." *Id.* (quotations omitted). Examples of patent–ineligible ideas include an algorithm for converting binary–coded decimal numerals into pure binary form in *Gottschalk v. Benson*, 409 U.S. 63 (1972); a mathematical formula for computing "alarm limits" in *Parker v. Flook*, 437 U.S. 584 (1978); the basic concept of hedging, or protecting against risk in *Bilski*; and intermediated settlement in *Alice*.

If the claims are drawn to a patent–*in*eligible concept, such as an abstract idea, then step two of the *Alice* test requires the Court to conduct a "search for the inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (quotation and brackets omitted). It is not enough for the patent applicant to point to the abstract idea and tell the reader to "apply it" in some context. *Id.* at 2357. An ineligible abstract idea cannot be made eligible merely by restricting its field of use. *Id.* at 2358 ("Thus, *Flook* stands for the proposition that the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment.") (quotation and brackets omitted). Nor is it sufficient to add "token postsolution components" to the abstract idea. *Bilski*, 130 S. Ct. at 3231; *Ultramercial*, 772 F.3d at 715 ("We do not agree…that the addition of merely novel or non–routine components to the claimed idea necessarily turns an

abstraction into something concrete.") (ellipsis added). Nor is "[t]he introduction of a computer into the claims" enough to alter the analysis at step two. *Alice*, 134 S. Ct. at 2357 (brackets added). "[T]he mere recitation of a generic computer cannot transform a patent–ineligible abstract idea into a patent–eligible invention." *Id*. at 2358 (brackets added). Adding a general–purpose computer is tantamount to instructing the reader of a patent to take the abstract idea and "'apply it with a computer'," which does not render an abstract idea patent–eligible. *Id*. "Nor, in addressing the second step of *Alice*, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept." *Intellectual Ventures I, LLC v. Capital One Fin. Corp.*, 2014–1506, *slip op.* at 6 (Fed. Cir. July 6, 2015) (citations omitted) (attached as Exhibit A). Accordingly, a claim that could be performed in the human mind or by putting pen to paper, albeit more slowly than by a computer, is not patent–eligible. *See Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).

Finally, an applicant may not render an abstract idea patent–eligible simply by selecting a different claim type. Whether the idea is expressed in a method claim, a system claim, or a computer media claim, any claim that expresses an abstract idea that does not "amount[] to significantly more than a patent upon the ineligible concept itself" is not patent–eligible. *Alice*, 134 S. Ct. at 2360 (brackets added). Holding otherwise would render patent–eligibility dependent not on the inventive concept expressed in the patent's claims, but rather on the draftsman's art, a result the Supreme Court has repeatedly warned against. *See id*.

These rules apply to *all* abstract ideas, whether broadly or narrowly defined. *See buySAFE*, 765 F.3d at 1353. ("[T]he Court has ruled that the exclusion applies if a claim

involves a natural law or phenomenon or abstract idea, even if the particular natural law or phenomenon or abstract idea at issue is narrow.") (brackets added).

In its post–*Alice* opinions, the Federal Circuit has affirmed that *Alice* is a powerful tool for weeding out vague and ill–defined patent claims, including claims relating to the organization and management of information. In a case very much like this one, the Federal Circuit held that patent claims to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that data in a memory" were patent–ineligible. *Content Extraction & Transmission*, 776 F.3d at 1347. In similar vein, the appellate court affirmed the patent–*in*eligibility of claims to the abstract "idea of retaining information in the navigation of online forms." *Internet Patents*, 2015 WL 3852975 at \*5. There is little to distinguish these ineligible abstract ideas from the storing and labeling of information claimed in the asserted patent here.

Just yesterday, the Federal Circuit affirmed a summary judgment that patent claims directed to "tracking financial transactions to determine whether they exceed a pre–set spending limit (*i.e.*, budgeting)," *Intellectual Ventures*, 2014–1506, *slip op.* at 7, and "customizing web page content as a function of navigation history and information known about the user," *id.* at 10, were patent–ineligible.  The appellate court has also held that patent claims to "offer–based price optimization" are patent–ineligible. *See OIP Techs.*, 2015 WL 3622181 at \* 3. So too claims to a device profile and a method for creating a device profile within a digital image processing system have been held patent–ineligible. *See DigiTech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014). In *buySAFE*, the Federal Circuit applied the *Alice* test to conclude that the asserted claims claimed the abstract idea of a third–party guaranty of a sales transaction executed by conventional computer technology and the Internet. *See* 765 F.3d at

1354–55. In *Planet Bingo, LLC v. VKGS, LLC*, __ Fed. Appx. __, 2014 WL 4195188 (Fed. Cir. Aug. 26, 2014), the Federal Circuit affirmed that the plaintiff's claims to computer–aided methods and systems for managing a game of bingo were subject matter–ineligible. The abstract idea of using an advertisement as an exchange or currency was held patent–ineligible in *Ultramercial*. *See* 772 F.3d at 714–16.

In the only post–*Alice* Federal Circuit opinion to uphold the patent–eligibility of an asserted patent, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the appellate panel found a computer–implemented method to be patent–eligible because the claims recited a specific manipulation of a general–purpose computer, not a "computer network operating in its normal, expected manner." *Id.* at 1258–59. Unlike patent–ineligible claims, "the claims at issue [in *DDR Holdings*] specif[ied] how interactions with the Internet are manipulated to yield a desired result——a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258 (brackets added).

In *Loyalty Conversion*, Circuit Judge Bryson, sitting in this Court by designation, limned the features of subject matter–ineligible claims drawn to abstract ideas:

> (1) they recite methods for performing a commonplace business function—such as currency conversion, hedging, or employing intermediated settlement in a financial transaction—typically by using a computer system or computer components to perform those methods; (2) they are aspirational in nature in that they describe the business function, but do not describe any novel manner of performing that function other than referring to the use of routine operations performed by a specially program[m]ed computer; and (3) the recitations referring to the use of a computer do not include any inventive measure that "purport[s] to improve the functioning of the computer itself." *CLS Bank*, 134 S. Ct. at 2359….

> In short, such patents, although frequently dressed up in the argot of invention, simply describe a problem, announce purely functional steps that purport to solve the problem, and recite standard computer operations to perform some of the steps. The principal flaw in these patents is that they do not contain an "inventive concept" that solves practical problems and ensures that the patent is directed to something "significantly more than" the ineligible abstract idea itself. *See CLS Bank*, 134 S. Ct. at 2355, 2357; *Mayo*, 132 S. Ct. at 1294.

13

2014 WL 4364848 at * 13 (ellipsis added).

It is an open question whether there is a presumption of subject–matter eligibility for purposes of Section 101 analogous to the presumption of validity applied to challenges under, *e.g.*, 35 U.S.C. §§ 102, 103, or 112. None of the quartet of recent Supreme Court cases on patent–eligibility has mentioned, much less applied, such a standard. *See Ultramercial*, 772 F.3d at 720–21 (Mayer, J., concurring). Moreover, "[t]he determination of whether a claim is drawn to patent–eligible subject matter is a pure question of law." *Kickstarter, Inc. v. Fan Funder, LLC*, 2015 WL 3947178, *5 (S.D.N.Y. June 29, 2015) (brackets added and citations omitted). More to the immediate point, in the context of a motion to dismiss, the court is asked to draw a legal conclusion based on assumed facts viewed favorably to the non–movant. *See id.* at *5 n.7. Accordingly, the Court here "does not have occasion to weigh facts using the 'clear and convincing' evidentiary standard" that would apply to a fact–based invalidity inquiry, such as whether a piece of prior art is anticipatory under 35 U.S.C. § 102. *Id.* Even so, the Court need not resolve the ultimate question to rule in Balsam's favor, as the legal conclusion that the claims of the '674 Patent are subject–matter ineligible is not altered no matter how many thumbs are pressed on the scale in favor of eDekka.

**Step One: Abstract Idea.** Consider now the steps or elements of representative method claim 1 and its apparatus equivalent, claim 17, using the helpful heuristic of asking whether the steps could be performed by a human with pen and paper. In light of the focus of the specification of the '674 Patent on audio information, imagine, for purposes of this example, an audiophile cataloguing a collection of vinyl records.

Step 1 is receiving and storing information in response to user input. *See* '674 Patent, 18:6–7 (claim 1); 20:36–37 (claim 17). At this step, our audiophile receives a new record album

from a used record store, say, Lyle Lovett's *Live in Texas*, released in 1999, and decides to shelve it by artist under "L".

Step 2 is designating the information as data while the information is being received. '674 Patent, 18:8–9 (claim 1); 20:39–41 (claim 17). She records the name of the artist, the title of the album, and the release date on a list.

Step 3 is designating at least a portion of the information as a label while the information is being received. '674 Patent, 18:10–12 (claim 1); 20:42–44 (claim 17). Our audiophile identifies the artist name and album title as label information for the album.

Step 4 is traversing a data structure and providing an indication of a location in the data structure. '674 Patent, 18:13–15 (claim 1); 20:45–47 (claim 17). She notes that she is shelving this album in the "L" section of her collection, using "Lovett" (as opposed to "Lyle") for purposes of alphabetization.

Step 5 is storing the label at the location in the data structure. '674 Patent, 18:16–17 (claim 1); 20:48–49 (claim 17). She places the notation for this album in alphabetical order in her album list, between Courtney Love and Loretta Lynn.

Step 6 is associating the label with the data. '674 Patent, 18:18 (claim 1); 20:50–51 (claim 17). She now has a label to correspond with the album now on the "L" shelf of her record collection, which she can locate from her list by artist name and album title.

The fact that this basic description of organizing (or reorganizing) a record collection using pen and paper satisfies the plain language of the limitations of these representative claims of the '674 Patent demonstrates that the asserted Patent claims nothing more than the abstract idea of labeling and storing information routinely performed by anyone organizing a library of anything. Whether or not the claims implicitly require computer equipment, the claims as written

at most instruct a reader to use generic equipment performing generic functions to implement an abstract idea that could be achieved by a record collector with pen and paper. *See buySAFE*, 765 F.3d at1355 ("That a computer receives and sends information over a network—with no further specification—is not even arguably inventive."); *Planet Bingo*, 2014 WL 4195188 at *3 (claims directed to selecting, storing, and retrieving information by a computer patent–ineligible).

**Step Two: No Inventive Concept.** Neither representative claims 1 and 17, nor any of the other claims of the '674 Patent, has the "something more" that *Alice* requires for patent– eligibility. 134 S. Ct. at 2354. The claim language does not identify *any* particular equipment to perform any of these generic functions. Further, as discussed, although the analysis must focus on the claims, even the specification identifies only generic equipment performing generic functions in routine ways already known in the art. *See Alice*, 134 S. Ct. at 2359 ("In short, each step does no more than require a generic computer to perform generic computer functions."). There is nothing more to these claims than the abstract idea of storing and labeling information performed the–claims–say–not–how.

The Supreme Court and Federal Circuit have made clear that the draftsman's art cannot recast a patent–ineligible method as a patent–eligible apparatus just by shifting the claim type. *See Alice*, 134 S. Ct. at 2360; *buySAFE*, 765 F.3d at 1351; *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013). Thus, eDekka cannot point to any claimed differences between the method and apparatus claims, the latter of which simply state that undefined means should be used to perform the steps of the method claims. Thus, the method and apparatus claims rise and fall together.

The remaining claims are no more than the core abstract idea "garnished with accessories." *Ultramercial,* 772 F.3d at 719.

Claims 7 and 35 simply reorder the steps of claims 1 and 17. An abstract idea reshuffled does not gain in concreteness.

Claims 2, 4, 6, 8, 10, 12, 14, 16, 23, 25–28, 33–34, 41, 43–46, 49, and 52 purport to limit the application of the abstract idea to "audio information" and a data structure that is "hierarchical." Patent–eligibility cannot be attained by limiting the application of an abstract idea to one technological environment or subject field. *See Alice*, 134 S. Ct. at 2358; *buySAFE*, 765 F.3d at 1355.

Claims 3, 9, 18, 20, 30, 36, 38, and 48 purport to add the concept of "conveying" either stored information or a label. Claims 21 and 39 refer to "deleting" a label. Claims 22 and 40 refer to "switching" labels. Claims 29, 31, 47, and 50 refer to "indicating" a location. At best, the concepts of "conveying," deleting," "switching," and "indicating" are additional generic functions generically described, which cannot save already ineligible claims. *See Alice*, 134 S. Ct. at 2359. Nothing about these claims informs the reader how the "invention" claimed purports to perform these functions. They just say that it will do so. *See Intellectual Ventures*, 2014–1506, *slip op.* at 14 ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent–eligibility.") (quoting *Alice*, 134 S. Ct. at 2359).

Claims 5 and 11 name some information "first information" and other information "second information." Claims 13, 15, 19, 24, 37, and 42 discuss the storing and labeling of "further information." Patent eligibility cannot depend on the "draftsman's art." *Mayo*, 132 S. Ct. at 1294 (quotation omitted). The renaming of multiple units of generically described "information" as "first," "second," or "further" is no less abstract than the naming of one such unit as "information" simpliciter.

Finally, claims 32 and 51 combine two of the "limitations" just discussed, the field restriction to audio information and hierarchical data structure with the ability to "indicate" the relative location of information in a data structure. No matter how many abstractions are added to an abstract idea, the idea remains abstract.

Put differently, one could readily incorporate all of these "limitations" into the story told above about the audiophile, her record collection, and her pen–and–paper "database" of information and labels without gaining any further insight into *how* the '647 Patent purports to represent any specific improvement in any technology or technical field. *See Alice*, 134 S. Ct. at 2359–60; *Intellectual Ventures I,* 2014–1506, *slip op.* at 14 ("Requiring the use of a 'software' 'brain' 'tasked with tailoring information and providing it to the user' provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer.").

Whether or not the specification of the '674 Patent could hypothetically have supported the issuance of patent–eligible claims—a question not before this Court—such claims were neither written, reviewed, nor approved by the Patent Office. The claims that were written, reviewed, and approved by the Patent Office are hopelessly abstract, and so, patent–ineligible. In the final analysis, the asserted patent suffers from the fundamental flaw that *Alice* sought to root out—it takes time–worn concepts of storing and labeling information and tells the reader to apply them to "information." "With the approach to this kind of section 101 issue clarified by *Alice*, it is a straightforward matter to conclude that the claims in this case are invalid." *buySAFE*, 765 F.3d at 1355.

## CONCLUSION

Based on the foregoing, Balsam respectfully requests that the Court grant its motion to dismiss.

Dated: July 7, 2015

Jennifer P. Ainsworth
WILSON, ROBERSTON & CORNELIUS, PC
909 ESE Loop 323, Suite 400
Tyler, TX 75701
Tel.:    (903) 509–5000
Fax:    (903) 509–5092
jainsworth@wilsonlawfirm.com

/s/ David Swetnam–Burland
Peter J. Brann
David Swetnam–Burland
Stacy O. Stitham
BRANN & ISAACSON
184 Main Street, 4th Floor
Lewiston, ME 04243−3070
Tel: (207) 786−3566
Fax: (207) 783–9325
pbrann@brannlaw.com
dsb@brannlaw.com
sstitham@brannlaw.com

*Attorneys for Balsam Hill LLC*

**CERTIFICATE OF SERVICE**

I certify that on July 7, 2015, I filed the foregoing Balsam's Motion to Dismiss with the

Clerk of the Court using the CM/ECF system, which will send notice to counsel of record.


/s/ David Swetnam–Burland
David Swetnam–Burland